# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

Your Affiant, Grant Garry, Special Agent with the Drug Enforcement Administration, being duly sworn, depose and say:

## INTRODUCTION AND AGENT BACKGROUND

1. Your Affiant is an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. Your Affiant is a Special Agent with the Drug Enforcement Administration. Your Affiant has been a Special Agent since July of 2024. Your Affiant assigned to the DEA Sierra Vista, Arizona Resident Office High Intensity Drug Trafficking Area (HIDTA) Southeastern Arizona Major Investigations Team (SAMIT).

3. Your Affiant has completed the Basic Agent Training held at the DEA Training Academy in Quantico, Virginia. Your Affiant has received specialized training in the fields of drug trafficking and money laundering. In Your Affiant's law enforcement career, Your Affiant has specialized in investigations involving drug trafficking and have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as the methods used to finance drug transactions; launder and transport drug proceeds; and conceal assets purchased with illegally-derived proceeds.

4. In addition to Your Affiant's experience as a Special Agent with DEA, Your Affiant was employed by the Department of Homeland Security ("DHS") as a Border Patrol Agent assigned to the Sonoita Border Patrol Station for eight (8) years. In Your Affiant's career, Your Affiant has become familiar with how drug trafficking organizations ("DTOs") operate. Your Affiant is familiar with how DTOs conceal, package, smuggle, transport, store, and distribute drugs as well as how they collect and launder drug proceeds. Additionally, Your Affiant is familiar with the tactics employed by DTOs to counter law enforcement investigative techniques. Your Affiant is also familiar with how drug smugglers use cellular phones and other electronic devices to coordinate and facilitate their illicit activities.

5. Your Affiant knows that drug traffickers often use multiple phones as a means of evading law enforcement detection of their crimes. Traffickers commonly will discontinue use of a phone (called "dropping" a phone) and acquire a replacement in a bid to remain one step

ahead of the police. To further evade law enforcement, they often will subscribe to a telephone using fictitious identifiers (e.g., false names and/or addresses) or in other people's names. Notwithstanding this behavior, Your Affiant knows that traffickers need to maintain continuity to effectively conduct business, which means that multiple phones belonging to a trafficker might share common pieces of information (e.g., common phone contacts). It is also possible to sync or transfer data among phones which means that a replacement phone may contain some or all of the same information that was acquired using the original "dropped" phone.

6. Finally, Your Affiant knows that traffickers often avail themselves of all the technologies available within a cellular telephone, including voice messaging, texting, audio communication, direct dial, push-to-talk, emailing, Internet access, speed dial, taking and storing photos and video, and maintaining lists containing contact information for their criminal associates to accomplish their criminal activities. Traffickers also will access third-party applications (e.g., WhatsApp, Facebook, Instagram) via their cellular phones to perform these same functions. Your Affiant is aware that most cellular telephones and third-party applications have the capacity to collect and store precise GPS data documenting the phone's physical location over time.

7. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. Your Affiant makes this affidavit partly based on personal knowledge derived from my participation in this investigation and partly on information that other law enforcement officers and witnesses have reported to me. Such statements are among many made by others and are relayed here in substance, unless otherwise indicated.

/ / /

/ / /

/ / /

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8. The electronic communication device to be examined is described as the following:

    a. One (1) black in color Samsung Galaxy A15 cellular telephone, bearing International Mobile Equipment Identity ("IMEI") 359156941953009, (hereinafter, the "Target Smartphone").

    The Target Smartphone to be searched pursuant to the attached application is further described in **Attachment A**.

## BACKGROUND ON SMARTPHONES

9. Based upon Your Affiant's knowledge, training, and experience, as well as information related to my law enforcement officers and others experienced in the forensic examination of electronic communication devices, Your Affiant knows that certain types of cellular telephones referred to as "smartphones" (such as the Target Smartphone) generally offer more advanced computing ability and internet connectivity than standard cellular telephones. Provided that internet access has been purchased through an electronic communication service provider for a particular smartphone, a smartphone is capable of running complete operating system software, has full access to the internet and/or electronic mail (including file attachments), is capable of text and instant messaging, can create and edit documents created with computer software, is capable of storing large amounts of data, and can be interfaced with desktop and laptop computers.

10. As described in Attachment B hereto, this affidavit seeks permission to locate not only data files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes what individual(s) used the Target Smartphone, as well as the purpose of its use. Additionally, this affidavit seeks information about the possible location of other evidence.

11. As described in Attachment B hereto, this affidavit also seeks permission to search and seize certain electronic records that might be stored within the Target Smartphone. Some of these electronic records might take the form of files, documents, or other data that are user generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

///

12. Although some of the records requested in this affidavit might be found in the form of user generated documents (such as electronic format documents and picture and movie files), an electronic communication device (such as the Target Smartphone) can contain other forms of electronic evidence that are not user generated. In particular, electronic communication devices may contain records of how it has been used and/or the person(s) who utilized the electronic communication device. Based upon my knowledge, training, and experience, as well as information related to me by law enforcement officers, and other persons involved in the forensic examination of electronic communication devices, Your Affiant knows that:

   a. Data on electronic communication devices not currently associated with any file can provide evidence of a file that was once on the electronic communication device, but has since been deleted or edited, or of a deleted portion of a file;

   b. Virtual memory paging systems can leave traces of information on an electronic communication device that can be used to determine what tasks and processes were recently in use;

   c. Web browsers, e-mail programs, social media platforms, and chat programs store configuration information on the electronic communication devices that can reveal information such as online nicknames and passwords;

   d. Operating systems can record additional information, such as the attachment of peripheral electronic devices, and the number of occasions on which the peripheral electronic devices were accessed;

   e. Computer file systems can record information about the dates that files were created and the sequence in which they were created. This information may be evidence of a crime and/or indicate the existence and/or location of evidence in other locations on the electronic communication device;

   f. When an electronic communication device has more than one user, files can contain information indicating the dates and times that the files were created, as well as the sequence in which the files were created, and whether a particular user accessed other information close in time to the file creation dates, times, and sequences;

   g. The types of evidence described above may be direct evidence of a crime, indirect evidence of a crime indicating the location of evidence or a space where evidence was once located, contextual evidence identifying an electronic communication device

4

user, and contextual evidence excluding an electronic communication device user. All of these types of evidence may indicate ownership, knowledge, and intent to commit a given offense; and

h. The foregoing type of evidence is not "data" that can be segregated, that is, this type of information cannot be abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators. Rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how electronic communication devices operate and how electronic communication devices are used. Therefore, contextual information necessary to understand the evidence described in Attachment B hereto also falls within the scope of the warrant.

13. Based on Your Affiant's training, experience, and research, Your Affiant believes that the Target Smartphone may have some, if not all, of the capabilities described above. Your Affiant bases their belief on the fact that Your Affiant has seized numerous phones in the past, has observed the difference between cell phones with these capabilities, and those that do not, and have had experience with countless cell phones capable of the functions stated above, as well as my discussions with experts on the capabilities of wireless telephones in general, and my personal research into the functions of certain brands and models.

**CHARACTERISTICS OF INDIVIDUALS INVOLVED IN DRUG-TRAFFICKING**

14. Your Affiant knows based on my training and experience that individuals involved in criminal activities such as drug trafficking are commonly in communication via cellular telephones with additional co-conspirators capable of providing resources in furtherance of criminal activity.

15. Often, persons tasked with the job of transporting illegal contraband into and within the United States communicate with the persons overseeing the transportation by wireless telephone before, and during, the time the load is in transit. Often, the drivers of the load vehicles often communicate with the Drug Trafficking Organization (DTO) coordinators and/or other co-conspirators for guidance and further direction once they are in the United States. At times, the load drivers are not informed of the delivery location until they have successfully entered the United States. Based on training and experience, I know that if the load driver knew in advance the final destination of the illegal contraband, and the load was to be seized at a checkpoint or otherwise, the driver would be in a position to direct law enforcement to the final destination if he/she cooperated. This could lead to the arrest of others.

16. Wireless telephones that are associated with drug traffickers often contain electronically stored data on or within the wireless telephone. This includes, but is not limited to, contact names and personal contact information of smuggling associates, call details and call history, electronic mail (email) messages, text messages and/or text message history, Global Positioning System (GPS) data indicating routes traveled and meeting locations used to facilitate drug trafficking, data pinned in maps to indicate possible meeting locations and destinations involved in the smuggling process, and digital images of drug trafficking associates and/or activity, all of which can be used to identify and locate smuggling associates, to identify methods of operation of the DTO, and to corroborate other evidence obtained during the course of the current investigation.

17. The stored information on the wireless telephones frequently include phone numbers of people who were in contact with the drug traffickers during their illegal activities, maps and photographs of routes of travel, and documents that possibly show illegal activity between people in the United States and abroad. It is not uncommon for individuals who are transporting illegal contraband to be in close proximity of others who are acting as a look out or in "scout" vehicles. The phone may contain information regarding incoming and outgoing calls placed at or near the time of the arrest of the individuals transporting the illegal contraband. This can provide agents with information regarding others who are involved in the organization.

18. DTOs often use text messages to coordinate between the individuals participating in any given smuggling event. The use of text is convenient because it is quiet, discreet, and can be read whenever it is opportune for whomever is receiving the message. Often times, directions are sent via text. Other messaging programs that the DTOs exploit include WhatsApp, WHISPER, and Facebook Messenger. They use these programs to solicit and recruit for drivers, scouts, heat vehicles, and lookouts to fill roles in the scheme. Often times payment for these jobs are discussed on these platforms. The DTO uses these platforms because they are usually more difficult to track.

19. Thorough examining data stored on the devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, evidence of the locations and identities of persons with which the device communicated, and communications (photographic and electronic) between members of DTOs.

/ / /

20. The large, well-established DTOs along the southwest border routinely compartmentalize their illegal operations. These DTOs employ various sub organizations or "cells", which independently accomplish such tasks as: the receipt and transportation of illegal narcotics, in and through Mexico; the importation of the illegal contraband into the United States; the storage and concealment of the illegal contraband along the southwest border in the United States; and the transportation of the illegal contraband from the southwest border to destinations within the interior of the United States.

21. Your Affiant knows that there are certain characteristics common amongst individuals involved in drug-trafficking activity that they tend to:

   a. Retain records pertaining to financial transactions and the persons for whom the transactions are being conducted;

   b. Collect data pertaining to other co-conspirators involved in drug-trafficking activity, including drug types and quantities provided, as well as monies owed and/or paid for illegal controlled substances;

   c. Possess and maintain records reflecting bank transactions and/or money transfers;

   d. Maintain collections of records that are in a digital or electronic format in a safe, secure and private environment, including electronic communication devices (such as the Target Smartphone). These records are often maintained for several years and are kept close in close proximity to the drug-trafficker, usually at the individual's residence, to enable the drug-trafficker to review the records, which are highly valued;

   e. Correspond with and/or meet with other drug-trafficking associates to share drug-trafficking information and/or materials;

   f. Retain correspondence from other drug-trafficking co-conspirators relating to drug-trafficking activity; and

   g. Maintain lists of names, addresses, and/or telephone numbers of individuals with whom the drug-traffickers have been in contact and/or conducted drug-trafficking activity.

## PROBABLE CAUSE

22. Your Affiant submits that there is probable cause to believe that the Target Smartphone to be searched may contain evidence identifying: (1) cellular telephone numbers used by drug-trafficking associates; (2) telephone calls conducted with drug-trafficking co-conspirators (to

include time, date, and duration of calls); (3) photographs of and/or with drug-trafficking co-conspirators, illegal controlled substances, and/or currency; (4) text and/or voicemail message communications (including time and date) with drug-trafficking associates; (5) electronic mail and social media internet sites accessed by the user of the Target Smartphones; and (6) usernames and/or passwords utilized by the user of the Target Smartphones to access electronic mail, downloaded documents and social media internet sites.

23. On December 11, 2024, at approximately 10:20 a.m., Isabel SALDATE-Chanes, a Mexican Citizen, entered the Nogales Border Patrol Checkpoint on Interstate 19 near Amado, AZ. SALDATE-Chanes was the driver and sole occupant of a white 2004 Nissan Armada bearing Sonoran, Mexico license plate number VWL403B. The registered owner of the vehicle is Isabel SALDATE-Chanes from Magdalena, Sonora, Mexico.

24. A Border Patrol Canine Agent ("BPAK9") was working primary inspection lane with his assigned Service Canine. The Canine alerted to an odor near the driver door area of the Nissan Armada, displaying a change in behavior that the BPAK9 recognized as an alert to an odor that she has been trained to detect.

25. As SALDATE-Chanes entered the primary canopy area, she stopped away from the next agent. The Border Patrol Agent ("BPA") conducting immigration inspections directed her to pull forward, at which point she complied. The BPA asked SALDATE-Chanes if there were narcotics inside the vehicle, to which she smiled and laughed, while responding "no." The BPA did not observe signs of nervousness. The vehicle was referred to Secondary inspection.

26. In the Secondary inspection area, the Canine performed a second sniff of the vehicle. The Canine positively alerted to a trained odor emitting from the rear cargo area and the ceiling of the vehicle.

27. The BPAK9 inspected the ceiling of the vehicle and discovered several bundles wrapped in cellophane and brown tape hidden under the headliner. An x-ray scan was conducted, revealing anomalies in the driver side rear quarter panel. BPAs removed the panel and discovered additional bundles wrapped in cellophane and some wrapped in foil. In total 70 bundles were removed from the vehicle.

28. The contents of the packages were field tested with the rapid response test kit for the properties of illicit drugs. The bundles field tested positive for the properties of methamphetamine

(approximately 29.68 kilograms), heroin (approximately 1.48 kilograms) and cocaine (approximately 2.54 kilograms).[1]

29. Your Affiant responded to the I-19 checkpoint to conduct further investigation. SALDATE-Chanes was transported to the DEA Tucson District Office to be interviewed. After gathering SALDATE-Chanes' biographical information, fingerprints, and DNA, SALDATE-Chanes was advised of her *Miranda* rights in Spanish, and agreed to participate in an interview. SALDATE-Chanes is a native Spanish speaker, and the interview was conducted in the Spanish language.

30. SALDATE-Chanes explained that on Saturday, December 7, 2024, her vehicle began making noises. She called her friend and co-worker, Edgardo Cortedo MORANDO, who picked up her vehicle on the same date and took it to a mechanic where he left the vehicle. SALDATE-Chanes stated that on Wednesday, December 11, 2024, an unidentified individual that she believed worked for the mechanic drove her vehicle to her, and told her they could not fix the issue because they needed a part that they did not have. SALDATE-Chanes stated she did not know this individual or have a name for this individual. She stated that she was told to drive to one of the auto-stores in Arizona and pick the part up. When she arrived in Nogales, Arizona, she looked for a "Napo Auto Parts Store" (Agents believe SALDATE-Chanes meant "NAPA Auto Parts"). SALDATE-Chanes stated she could not find the store and then sent MORANDO texts messages, via WhatsApp, that she was unable to find the store. MORANDO responded via voice-notes that the location was in Tucson, AZ near Valencia Road and Ajo Way. When she asked for an address, MORANDO messaged that he would tell her when she arrived in the area.

31. During the interview, SALDATE-Chanes gave consent to search her cellular phone and signed form DEA-88 "Consent to Search." SALDATE-Chanes also provided the numerical passcode to her phone. Agents performed a cursory review of the cellular phone and located a conversation between SALDATE-Chanes and MORANDO in which he indicated he would provide an address to an auto parts store once she arrived at a location in Tucson.

32. SALDATE-Chanes stated she had also intended to do some shopping while in the United States. She stated that only her children and MORANDO knew that she was going to be in

---

[1] DEA Investigators also field tested each package containing three different illicit drugs at the DEA Tucson District Office. Each test produced a positive test for methamphetamine, heroin, or cocaine.

Arizona. SALDATE-Chanes stated she did not know anything had been placed in her vehicle, and denied knowledge of the illicit substances.

33. When asked if there was anyone she knew that would want to set her up. SALDATE-Chanes responded that there was one female colleague she believed could be angry enough to set her up, Alba Gloria Ebana MENDOZA. Agents described the substances and quantity located inside her car, and explained that the street value is approximately $100,000.00 USD, to which SALDATE-Chanes stated "They found that much? Wow," with little emotion. SALDATE-Chanes maintained that the female is the only person she can think of that would be willing to set her up, and that MORANDO is the only other person who had the vehicle.

34. SALDANTE-Chanes stated she did not know where the mechanic shop was located and attempted to find MORANDO's home address using google maps but was only able to give a general location in Imuris, Sonora, Mexico. SA Geller asked how well SALDATE-Chanes knew MORANDO to which she responded very well. They were in school together, kept in touch as adults and have been colleagues for almost two years.[2]

35. While conducting law enforcement database queries, Your Affiant found, through Homeland Security Investigator (HSI) SA Ryan Dolan, that SALDATE-Chanes had crossed the international border 11 times from the October 19, 2024 to December 11, 2024, including December 7, 2024. Within those crossing dates, SALDATE-Chanes only crossed the Nogales I-19 checkpoint a total of four (4) times.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

36. Based on Your Affiant's knowledge, training and experience, Your Affiant knows that electronic devices such as the cell phones in this case, can store information for long periods. Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

---

[2] MORANDO has been identified as a facilitator and coordinator of the transportation in vehicles of methamphetamine, cocaine and heroin from Mexico into the United States through the Nogales Port of Entry in Nogales, Arizona.

37. *Forensic Evidence.* As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the cell phones were used, where they were used, the purpose of their use, who used them and when. There is probable cause to believe that this forensic electronic evidence will be on these devices, as is more fully set forth in the factual section contained herein and because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including text messages, video, or photographs.

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user of the cell phone did not have a relationship with the party.

38. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant Your Affiant is applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not

limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

39. The Target Smartphone has been properly stored by the United States Department of Homeland Security. Due to the nature of wireless telephones, data contained within will remain uncorrupted when being stored for an extended period.

40. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

41. Based upon the foregoing facts and circumstances, Your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Smartphone, described in Attachment A to seek the items described in Attachment B.

Having signed this affidavit under oath, Your Affiant states that its contents are true and correct to the best of my knowledge, information, and beliefs.

_____
Grant Garry
Special Agent
Drug Enforcement Administration

Subscribed and sworn to telephonically, before me
this ___2nd___ day of January, 2025

_____
Hon. Eric J. Markovich
United States Magistrate Judge
District of Arizona